*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *ANNE-MARIE BUBAR,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| *v.* | ) | *No. 2:16-cv-00201-JHR* |
| | ) | |
| *NORDX,* | ) | |
| | ) | |
| *Defendant* | ) | |

*MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR REMITTITUR AND PLAINTIFF'S MOTION TO AMEND JUDGMENT*

Following a four-day trial, a jury found NorDx liable for whistleblower retaliation against its former employee Anne-Marie Bubar, awarding her $50,000 in lost pay and benefits and $450,000 in punitive damages. *See* Verdict Form (ECF No. 75); Amended Judgment (ECF No. 90). NorDx moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) or remittitur of damages pursuant to Federal Rule of Civil Procedure 59(e), *see* NorDx's Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for New Trial on Plaintiff's Unsupported Whistleblower Retaliation Claim, or for Remittitur ("Defendant's Motion") (ECF No. 84) at 1, and Bubar moves to amend the judgment pursuant to Rule 59(e) to add awards of front pay and prejudgment interest, *see* Plaintiff's Post-Trial Motion To Alter or Amend Judgment ("Plaintiff's Motion") (ECF No. 83). For the reasons that follow, I deny NorDx's motion, grant Bubar's motion in part to the extent that I award prejudgment interest, albeit in the sum of $1,635 rather than $3,230, and otherwise deny it.

1

# I. NorDx's Post-Trial Motion

## A. Rule 50(b) Motion for Judgment as Matter of Law

### 1. Applicable Legal Standard

To succeed on a renewed motion for judgment as a matter of law, a party must demonstrate that "the facts and inferences are such that no reasonable factfinder could have reached a verdict against the movant." *Webber v. Int'l Paper Co.,* 326 F. Supp.2d 160, 165 (D. Me. 2004). The court must not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 50 (1st Cir. 2003) (citation and internal quotation marks omitted). Instead, the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor." *McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals,* 140 F.3d 288, 299 (1st Cir. 1998) (citation and internal quotation marks omitted).

A jury verdict should not be set aside as a matter of law "unless there was only one conclusion the jury could have reached." *Id.* Specifically, the court's review "is weighted toward preservation of the jury verdict[,]" which the court must uphold "unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[ ] that no reasonable jury could have returned [it]." *Rodowicz v. Mass. Mut. Life Ins. Co.,* 279 F.3d 36, 41-42 (1st Cir. 2002) (citation and internal quotation marks omitted). *See also, e.g., Climent-García v. Autoridad de Transporte Marítimo y Las Islas Municipio*, 754 F.3d 17, 20 (1st Cir. 2014) ("The tide runs strongly against a litigant seeking to overturn a jury verdict.").

### 2. Discussion

To make out a case of whistleblower retaliation pursuant to the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S.A. §§ 831-40, an employee must show that "(1) . . . [she]

engaged in a protected activity; (2) . . . the employer took adverse employment action against [her]; and (3) . . . there was a causal connection between the two." *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 32, 126 A.3d 1145, 1156 (*as corrected* Mar. 8, 2016).  Activities protected pursuant to the WPA include the following:

> The employee, acting in good faith, . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States[.]

26 M.R.S.A. § 833(1)(A).

"Neither [Maine] nor federal law requires that the reported condition, activity, or practice actually *be* unsafe or illegal; under either scheme, an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to his employer in good faith." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cir. 1999) (emphasis in original).

Pursuant to the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), once an employee has made out a *prima facie* case, the burden shifts to her employer to proffer "a legitimate, nonretaliatory reason for the [adverse action]." *Id*. at 262.  If the employer does so, the burden then shifts to the employee to "adduce significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked [her] dismissal." *Id*.[1]

---

[1] In *Brady*, the Law Court jettisoned the application of the three-step *McDonnell Douglas* burden-shifting analysis on summary judgment in WPA retaliation cases, reasoning that, because an employee must present evidence of causation as part of her *prima facie* case, the second and third phases of the burden-shifting analysis are redundant for purposes of determining whether there is a triable issue of causation.  *Brady*, 2015 ME 143, ¶¶ 36, 39, 126 A.3d at 1157-58. However, the Law Court expressly stated that *Brady* did not present it with an opportunity to address whether the burden-shifting analysis remained a useful analytical tool for trial.  *Id*., 2015 ME 143, ¶ 39 n.9, 126 A.3d at 1158 n.9. Therefore, it applies here.

NorDx moves for judgment as a matter of law on the bases that the jury lacked sufficient evidence to find that (i) Bubar made out a *prima facie* case of whistleblower retaliation, (ii) Bubar was fired as a pretext for whistleblower retaliation, or (iii) NorDx's conduct warranted punitive damages, which in any event are excessively high. *See* Defendant's Motion at 2-21. For the reasons that follow, NorDx fails to surmount the hurdle of demonstrating, as to any of these points, that "the evidence was so strongly and overwhelmingly inconsistent with the verdict[ ] that no reasonable jury could have returned [it]." *Rodowicz,* 279 F.3d at 41-42 (citation and internal quotation marks omitted).

### a. *Prima Facie* Case

NorDx first contends that the jury lacked sufficient evidence to find that Bubar met either the first or third prongs of her *prima facie* case of whistleblower retaliation (that is, that she engaged in protected activity or that there was a causal connection between any such activity and her discharge from NorDx's employment). *See* Defendant's Motion at 3-12.

### i. First Prong: Activity Protected by WPA

NorDx identifies three instances of conduct on which it presumes Bubar relied to demonstrate that she engaged in protected activity, *see id*. at 4-5:

1. On October 17, 2012, Bubar emailed Human Resources ("HR") Supervisor Tracy Cote, stating, "I am in a situation right now that I am feeling harassed and threatened. I need your guidance." Plaintiff's Exh. 16; Transcript of Testimony of Anne-Marie Bubar ("Bubar Tr."), Vol. I (ECF No. 79) at 46-47. Cote wrote back that she was unavailable that day and that Bubar should contact HR Director Maria Gagnon as soon as possible to discuss her concerns. *Id*. Bubar called Gagnon, leaving a message to return her call, which she described as "important[.]" Bubar Tr., Vol. I at 47. Gagnon never did so. *Id*. *See also id*. at 36-37.

2.     About six months later, in March 2013, Bubar met with Cote, after which Bubar wrote to her on March 25, 2013, "Thank you for the meeting, it did clear the air as I was feeling a bit pressured. Very helpful." Dft's Exh. 232; Bubar Tr., Vol. II (ECF No. 80) at 6-7. Bubar testified that this pressure was from her supervisor, Shirley Lewis, and that she had "mentioned that multiple times." Bubar Tr., Vol. II at 7.

3.     The next year, at a December 10, 2014, meeting with HR Partner Rachel Roy and NorDx employee Pat Burner, Bubar stated that she was feeling harassed by Lewis. *Id.*, Vol. I at 33 & Vol. II at 43. Roy responded, "[N]o, she is a nice lady, she wouldn't be harassing you." *Id.*

NorDx underscores that, although Bubar reported to Cote in 2012 that she was being harassed and threatened, she never stated that she believed this conduct was occurring for an illegal reason, and, in following up with a voicemail to Gagnon, she merely stated that her call was "important." Defendant's Motion at 5. It contends that, in 2013, Bubar simply reported to Cote that she was feeling pressured, and Cote addressed her concerns. *See id.* at 6. Finally, it asserts that Bubar never testified that, in complaining to Roy in 2014 that she was being harassed by Lewis, she was reporting that she believed Lewis was doing something illegal. *See id.* at 7. Indeed, NorDx notes, Bubar testified that she did not know how to answer the question whether she thought Lewis was harassing her in a way that violated NorDx's Employee Handbook and denied that Lewis called her names or made any comment that was sexual in nature or concerned her gender or national origin. *See id.* at 8-9; Bubar Tr., Vol. II at 46-47.

NorDx argues that there was no evidence from which a reasonable jury could conclude that Bubar harbored the requisite subjective belief that the harassment of which she complained was illegal or, if she did, that any such belief was objectively reasonable. *See* Defendant's Motion at 9-10. It contends that both the Law Court and the First Circuit have found that no reasonable belief

5

existed in cases in which the illegality was "much more plausible than [in] the case at hand." *Id.* at 10-12 (discussing *Galouch v. Dep't of Prof'l & Fin. Regulation*, 2015 ME 44, 114 A.3d 988, *Bard v. Bath Iron Works Corp.*, 590 A.2d 152 (Me. 1991), and *Higgins*).

Nonetheless, as Bubar counters, *see* Plaintiff's Opposition to Defendant's Renewed Rule 50 Motion, Motion for a New Trial, and Motion for Remittitur ("Plaintiff's Opposition") (ECF No. 88) at 4-10, the jury had sufficient evidence to find that she subjectively believed that the harassment that she had reported was unlawful and that her belief was objectively reasonable.

NorDx terminated Bubar's employment effective February 18, 2015, when she was 66 years old and had taken short-term disability leave that had ended approximately five months earlier, following which she had provided doctor's notes barring her performance of phlebotomy indefinitely effective October 29, 2014, and permitting her to perform phlebotomy only one hour per week effective January 9, 2015. *See* Plaintiff's Exhs. 51, 60, 66; Bubar Tr., Vol. I at 6-7, 84, 87, 102-03. There was evidence, including the following, from which the jury reasonably could have found that Bubar subjectively believed that the reported harassment was based on age and/or disability discrimination and that this belief was objectively reasonable:

1.      Bubar had received very positive performance evaluations for the first 25 years of her employment, *see* Bubar Tr., Vol. I at 7, was considered a role model in phlebotomy skills, *see id.* at 41, and was never disciplined prior to the year 2008, *see id.* at 13, 129.

2.      Bubar was "harassed by Shirley Lewis for a long time." *Id.*, Vol. II at 46. For example, on numerous occasions, Lewis asked Bubar when she was going to retire. *See id.,* Vol. I at 11-12; *see also id.*, Vol. II at 47 (Lewis "multiple times asked me when I was going to retire[,]" making Bubar "wonder why does she keep asking me that? . . . I am not ready to retire.").

3.     Bubar felt harassed by Lewis's repeated questioning as to when she was going to retire.  *See id.*, Vol. II at 69.

4.     Even though Bubar was a "very good" and "conscientious" worker, Lewis asked a much younger employee, in his early 20s, to check her work and see if she made mistakes.  *Id.*, Vol. I at 32-33.

5.     Bubar did not believe that Lewis treated her fairly when she received a two-day suspension without pay for something that this younger employee did all the time.  *See id.* at 58-59.

6.     Victoria Babb, a former Group Leader at NorDx, testified at trial that Lewis had favorites, favored younger people at times, could be tough or not, depending on the person, and did not like Bubar.

7.     Bubar felt pressured by Lewis after she suffered a work-related back injury in December 2012.  *See id.* at 47-49; Plaintiff's Exh. 18.  An outside entity, WorkWell, concluded that Bubar had a permanent restriction against drawing blood in awkward positions.  *See* Plaintiff's Exh. 18.  Following a team meeting in March 2013, NorDx approved the restriction, and Cote suggested that Bubar apply for FMLA leave if need be as a result of her back injury.  *See id.*; Bubar Tr., Vol. II at 8.  Bubar testified that her "FMLA situation[,]" not her harassment by Lewis, was resolved at that time.  *Id.*

8.     Bubar was approved for a short-term disability leave from June 16, 2014, through September 15, 2014, following a traumatic incident in which a nursing home reported her of suspected elder abuse following a failed blood draw in April 2014, as a result of which Lewis and Burner informed her that NorDx was suspending her from work pending an investigation.  *See id.*, Vol. I at 64-67, 84-85.  She was cleared of wrongdoing, although she learned only informally from

another employee at an employee awards event that her suspension from work had ended. *See id*. at 67.

9.      Bubar's return to work was rough.   Her preexisting anxiety condition was exacerbated to the point that, despite increases in medication dosages, she had difficulty performing her job and felt she was being singled out and her work was being scrutinized more closely than that of others. *See id*. at 68-69, 73-74.   She had developed a mental block against drawing blood. *See id*. at 79.   Asked if she felt Lewis supported her through her difficult situation, she testified: "I didn't feel like I got any support.   I just felt like I was a criminal.   I had caused a problem." *Id*. at 69.   With Bubar's doctor's support, she went on approved short-term disability leave on June 16, 2014. *See id*. at 74.

10.     Prior to September 15, 2014, Bubar returned to work two days a week with a restriction against any performance of phlebotomy. *See id*. at 78-79, 84-85.   She increased her hours to 32 per week as of September 15, 2014. *See id*. at 85.   She provided NorDx a doctor's note stating that, effective October 29, 2014, she was not able to perform phlebotomy indefinitely. *See id*. at 87.

11.     NorDx informed Bubar that it could not accommodate that restriction because phlebotomy was an essential function of her job. *See id*. at 98-99.   During Bubar's December 10, 2014, meeting with Roy and Burner, Roy outlined three options: Bubar could work with her health-care provider to increase her ability to perform phlebotomy on a gradual basis, apply for a NorDx position that did not require phlebotomy as an essential function, or terminate her employment with NorDx. *See id*. at 100-01.   She chose the first option, *see id*. at 100, and submitted a doctor's note permitting her performance of phlebotomy beginning January 9, 2015, for a total of one hour per week in an outpatient setting, *see id*. at 103.

12.     Bubar sent an email to Roy on January 11, 2015, inquiring whether Roy had received a voicemail she had left her.  *See id*. at 105; Plaintiff's Exh. 64.  Roy responded that she had received Bubar's doctor's note, was catching up on voicemails left the prior week, and did not recall Bubar's voicemail.  *See id*.  Roy never followed up with a call to Bubar.  *See* Bubar Tr., Vol. I at 106.

13.     Bubar did not feel that NorDx followed its own policy regarding reports of harassment in response to her October 17, 2012, email to Cote, *see id*. at 33, 46-47, her follow-up voicemail to Gagnon shortly afterward, *see id*. at 36-37, or her December 10, 2014, report to Roy in Burner's presence, *see id*. at 33 & *id*., Vol. II at 43.

Against this backdrop, the jury reasonably could have found that Bubar subjectively believed that Lewis was harassing her based on her age and/or disability and that her belief was objectively reasonable in view of the age-based and/or disability-based animus one could discern in Lewis' conduct as described, even if that conduct was not actually illegal.[2]

While Bubar did not explicitly state in her reports to NorDx that her harassment was unlawful or based on her age, disability, or other protected status, that is not fatal on the facts viewed in the light most favorable to the verdict.

 "[T]he WPA does not require an employee be able to cite to a particular statute or rule that may have been violated."  *Galouch*, 2015 ME 44, ¶ 15, 114 A.3d at 993 (footnote omitted).  The jury reasonably could have found that Bubar's use of the words "harassed" or "harassment" in

---

[2] In its reply brief NorDx argues that, even if Bubar subjectively believed that she was reporting illegal activity, any such belief was objectively unreasonable because the jury returned a verdict in NorDx's favor on Bubar's claims of age discrimination, disability discrimination, failure to accommodate her disability, and retaliation against her on the basis of her exercise of FMLA leave, and the court found as a matter of law that NorDx had not interfered with her FMLA rights.  *See* NorDx's Reply to Plaintiff's Opposition to Renewed Rule 50 Motion, Motion for New Trial, and Motion for Remittitur ("Defendant's Reply") (ECF No. 94) at 7.  This is not dispositive in NorDx's favor, however, because, as noted above, "[n]either [Maine] nor federal law requires that the reported condition, activity, or practice actually *be* unsafe or illegal[.]"  *Higgins*, 194 F.3d at 261-62 (emphasis in original).

reports made to members of the NorDx HR Department sufficed to put NorDx on notice of a complaint of unlawful harassment. In this regard, it is significant that the NorDx Employee Handbook directs employees to report harassment to a supervisor, manager, or the HR Director, *see* Ptf's Exh. 8 at Bates No. N 2485, states that employees are "entitled to a work environment free of verbal, physical, visual and other harassment regardless of [their] race, color, religion, gender, *age*, national origin, *handicap*, veteran status, sexual orientation or citizenship status[,]" *id*. (emphasis added), and defines "harassment" as "includ[ing], but . . . not limited to, verbal abuse such as offensive racial, ethnic or sexual threats or comments, physical overtures, rude or threatening gestures, or any type of pressure to engage in sexual activity[,]" *id*. at 9, thereby generally targeting potentially illegal conduct.

While, as NorDx rejoins, *see* Defendant's Reply at 4, not all harassment is illegal, the jury reasonably could have found that, given NorDx's own definition of the term, and the context in which the reports were made, Bubar's 2012 reports to Cote and Gagnon, 2013 report to Cote, and 2014 report to Roy, all of whom were HR staff, should have been understood as reports of perceived unlawful harassment.

Bubar explicitly reported to Cote on October 17, 2012, that she felt "harassed and threatened." Plaintiff's Exh. 16. While she merely informed Gagnon in her voicemail that her call was "important[,]" Bubar Tr., Vol. I at 47, the jury reasonably could have inferred that Gagnon knew that the call related to Lewis's alleged harassment of Bubar, given Cote's instruction to Bubar that she contact Gagnon, the temporal proximity of the subsequent voicemail, and the fact that Gagnon was Cote's superior. Bubar testified that Lewis had harassed her for a long time and that she (Bubar) had mentioned multiple times at work that she felt pressured by Lewis. Babb testified that Lewis had favorites, did not like Bubar, and could be tough or not, depending on the

person. The jury reasonably could have inferred that Cote understood that Bubar was reporting that Lewis was harassing her and informed Gagnon, the Director of HR and presumably Cote's supervisor, of the substance of Bubar's report. *See, e.g., Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶¶ 18-20, 129 A.3d 944, 950-51 (a jury reasonably could infer that nursing home administrator knew of employee's complaints about staffing levels when, *inter alia*, such complaints could or should have been reported to administrator).

In the same vein, the jury reasonably could have inferred that Cote knew in March 2013 that the pressure Bubar felt following her 2012 back injury was emanating from Lewis, that this was part and parcel of the harassing conduct that Bubar had reported in 2012, and that Cote, again, reasonably could have been expected to inform Gagnon, the HR Director.

Finally, during Bubar's November 10, 2014, meeting with Roy and Burner, Bubar explicitly stated that she was feeling harassed by Lewis.

The jury reasonably could have found on this evidence that members of the NorDx HR Department ignored or trivialized all of these reports, demonstrating a pattern of nonresponiveness.

*Galouch*, *Bard*, and *Higgins* are materially distinguishable. In *Galouch*, the Law Court upheld the trial court's conclusion on summary judgment that, even if an employee subjectively believed that a court reporter's alleged breach of contract was illegal, a reasonable person would not consider a breach of contract a violation of the law. *See Galouch*, 2015 ME 44, ¶¶ 13-16, 114 A.3d at 992-94. Similarly, in *Bard*, the Law Court upheld the trial court's judgment against an employee at the close of his case during a bench trial on the basis that his testimony established no more than that he subjectively believed that a violation of contract provisions (rather than a violation of law) might have occurred. *See Bard*, 590 A.2d at 154-55. Here, as discussed above, the jury reasonably could have found, based on Bubar's testimony as a whole, that she subjectively

believed that Lewis's persistent harassment stemmed at least in part from her age and/or disability and that this belief was objectively reasonable.

In *Higgins*, the First Circuit found that there was no basis to believe that an employee's complaints about a supervisor constituted protected speech when the employee had neither argued to the trial court on summary judgment that this was so nor maintained that facts existed to support a reasonable belief to that effect. *See Higgins*, 194 F.3d at 262. In that context, the First Circuit observed, "the mere inclusion in the record of [the employer's] internal policy against discrimination based on sexual orientation does not . . . evidence either [the employee's] state of mind or the reasonableness of his beliefs." *Id.* In this case, Bubar has maintained from the inception of this litigation that she was fired in retaliation for whistleblowing, *see* Complaint and Demand for Jury Trial ("Complaint") (ECF No. 1) ¶¶ 74-80, and has not relied solely on an employee handbook to demonstrate that this was so.

### ii. Third Prong: Causation

NorDx notes that, with respect to federal claims of retaliation pursuant to Title VII, the First Circuit has held that a showing of discharge soon after an employee engages in protected activity "'is indirect proof of a causal connection.'" Defendant's Motion at 4 (quoting *Oliver v. Digital Equip. Corp*., 846 F.2d 103, 110 (1st Cir. 1988)). However, it points out that the First Circuit has deemed periods of three to four months between protected activity and an adverse employment action insufficient to establish a *prima facie* case of causation based on temporal proximity. *See id*. (citing *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004)).

NorDx argues that no reasonable jury could have found that Bubar made out a *prima facie* case that her firing was causally related to her October 2012 report, which was made 28 months

prior to her discharge, or her March 2013 report, made almost two years prior thereto. *See id*. at 6.

I do not understand NorDx to argue that the two-month gap between the December 2014 report and the January 2015 discharge failed to establish a *prima face* case of causation. *See id*. In any event, as Bubar observes, *see* Plaintiff's Opposition at 11, the Law Court has indicated that a two-month gap suffices to establish a causal nexus for purposes of the WPA, *see Cormier*, 2015 ME 161, ¶ 22, 129 A.3d at 952. In turn, the fact that the 2014 report was sufficiently close in time to Bubar's discharge to establish causation placed her substantially similar earlier reports in play, even if each was not sufficiently close in time, standing alone, to establish a causal nexus. *See, e.g., id*., 2015 ME 161, ¶ 22, 129 A.3d at 951 (based on "evidence that [employee] first complained about staffing issues in the spring of 2011 and that her last complaint was on December 28, 2011[,]" three days after which she was suspended and several more days after which she was fired, "the close temporal proximity among these events could be a sufficient basis for a jury to find that [employee's] complaints were at least in part a substantial motivation for [administrator's] decision to terminate her from employment").

In short, a reasonable jury could have found a causal nexus on the facts viewed most favorably to Bubar.

**b. Ultimate Showing of Discriminatory Animus**

NorDx next argues that no reasonable jury could have found that Bubar's firing was a pretext for discrimination because NorDx fired her for making an admitted identification error two months after receiving a final written warning for the same kind of mistake. *See* Defendant's Motion at 12-13. Yet, for the reasons discussed above, a reasonable jury could have concluded that retaliatory animus was a motivating factor in Bubar's discharge.

### c. Award of Punitive Damages

NorDx contends that, even if the verdict in favor of Bubar on her WPA claim stands, the jury's award of punitive damages should be struck as a matter of law pursuant to Rule 50(b) on any of four alternate bases: that (i) punitive damages cannot be awarded absent an award of compensatory damages, (ii) there was no evidence of reprehensible conduct, (iii) no member of NorDx upper-level management was involved in any discriminatory conduct, and (iv) the award was excessive. *See* Defendant's Motion at 13-14.

It is the "sole province of the factfinder" to determine damages, and a jury award cannot be disturbed "unless there is *no basis* in the evidence for the award or unless the jury acted under some bias, prejudice, or improper influence." *Harris v. Soley*, 2000 ME 150, ¶ 26, 756 A.2d 499, 507 (citations and internal quotation marks omitted) (emphasis in original). For the reasons that follow, I find no basis on which to disturb the jury's punitive damages award in this case.

### i. Lack of Award of Compensatory Damages

The jury awarded Bubar $50,000 "to compensate her for lost pay and benefits" but $0 "for emotional pain and other noneconomic losses that she experienced" as a result of whistleblower retaliation. Verdict Form ¶¶ 5-6. NorDx cites *Zemero Corp. v. Hall*, 2003 ME 111, ¶ 10, 831 A.2d 413, 416, for the proposition that "a court cannot award punitive damages in the absence of a corresponding award of compensatory damages." Defendant's Motion at 14 (internal quotation marks omitted). It notes that, by definition in Maine, back pay is not a form of compensatory damages. *See id.*; 5 M.R.S.A. § 4613(2)(B)(8)(d); *Ginn v. Kelley Pontiac-Mazda, Inc.*, 2004 ME 1, ¶ 7, 841 A.2d 785, 787 ("The award of back pay is an equitable remedy under the [MHRA][.]").

However, as Bubar argues, *see* Plaintiff's Opposition at 14, *Zemero* is distinguishable in that the plaintiff sought no compensatory damages, and no monetary award was made except for

the punitive damage award, *see Zemero*, 2003 ME 111, ¶¶ 5, 11, 831 A.2d at 415-16. More importantly, as Bubar notes, *see* Plaintiff's Opposition at 14-15, the *Zemero* court quoted the following passage from *DiPietro v. Boynton*, 628 A.2d 1019, 1025 (Me. 1993), for the proposition that punitive damages cannot be awarded absent an award of compensatory damages: "Punitive damages . . . will lie only when the plaintiff receives compensatory *or actual damages* based on the defendant's tortious conduct[,]" *Zemero*, 2003 ME 111, ¶ 11, 831 A.2d at 416 (internal quotation marks omitted) (emphasis added). In *DiPietro*, as in *Zemero*, the Law Court upheld the trial court's grant of a defendant's motion to set aside a punitive damages award to a plaintiff to whom the jury had awarded no compensatory damages (or actual damages of any kind). *See DiPietro*, 628 A.2d at 1021, 1025.

While back pay is not a form of "compensatory damages" in Maine, NorDx neither cites a case expressly holding that, in Maine, an award of back pay by a jury will not support an award of punitive damages, nor offers any reason why an award of back pay does not qualify as a form of "actual damages" for purposes of *DiPietro*, *see* Defendant's Reply at 9-10.

NorDx does argue that "[t]here is a common sense reason why punitive damages may not be awarded in the absence of an award of compensatory damages": that "[c]onduct that does not cause any pain, suffering or emotional distress cannot, by definition, meet the heightened malicious or reprehensible conduct necessary to support an award of punitive damages." Defendant's Motion at 15. Yet, NorDx cites no authority for this proposition and, as Bubar counters, *see* Plaintiff's Opposition at 16-17, the U.S. Supreme Court has held otherwise, *see, e.g., TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 446, 451, 453, 459 (1993) (upholding punitive damage award of $10 million after jury awarded $19,000 in actual damages for the cost of defending a declaratory judgment; observing that, if a man fired wildly into a crowd, by sheer

chance breaking only a $10 pair of glasses, "[a] jury reasonably could find only $10 in compensatory damages, but thousands of dollars in punitive damages to teach a duty of care") (citation and internal quotation marks omitted).

NorDx also observes that, to obtain punitive damages on an employment discrimination claim, an employee "'must demonstrate some form of reckless or egregious conduct or otherwise every employment discrimination claim [could] include a punitive damage award because every employment discrimination plaintiff must demonstrate an intentional unlawful discrimination.'" Defendant's Motion at 15 (quoting *Dudley v. Wal-Mart Stores, Inc*., 166 F.3d 1317, 1322 (11th Cir. 1999)). However, as NorDx further notes, "'Examples of such egregious conduct might include: (1) a pattern of discrimination, (2) spite or malevolence, *or* (3) a blatant disregard for civil obligations.'" *Id*. (quoting *Dudley*, 166 F.3d at 1322-23) (emphasis added). In this case, for the reasons discussed above, the jury reasonably could have found a pattern of discrimination or a blatant disregard for civil obligations, particularly where Bubar was communicating directly with the NorDx HR Department.

On the showing made, I decline to strike the jury's punitive damage award on this basis.

## ii. Lack of Evidence of Reprehensible Conduct

NorDx next argues that, as a matter of law, its conduct was not so reprehensible as to warrant punitive damages because it had in place policies prohibiting discrimination and retaliation. *See id.* at 15-16 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 544 (1999), for proposition that an employer's good-faith efforts to comply with the law demonstrate "that it never acted in reckless disregard of federally protected rights") (internal quotation marks omitted). It asserts that courts have held that the existence of a written policy instituted in good faith has operated as a total bar to employer liability for punitive damages or, at the very least, gone a long

way toward dispelling claims of an employer's reckless or malicious state of mind. *See id.* at 16 (citing *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983-84 (4th Cir. 1997)).

In the alternative, it contends that the conversation between Bubar and Roy on December 10, 2014, cannot form the basis for an award of punitive damages, Bubar having merely stated that she was being harassed in some unspecified form by Lewis and Roy having responded that Lewis was "a nice lady" who would not be harassing Bubar. *Id.* (internal quotation marks omitted). It adds that, to the extent that Gagnon's failure to return Bubar's call in October 2012 is even relevant, given the sheer passage of time before Bubar was fired, Gagnon's nonresponse, while not ideal, must be considered in the context that Bubar left a general voicemail that did not identify the subject matter of her call. *See id.* at 16 n.3.

On the first point, Bubar correctly notes that the *Kolstad* affirmative defense is available when a company proves not only that it created but also that it implemented policies designed to prevent unlawful discrimination. *See* Plaintiff's Opposition at 19-20; *see also, e.g., Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000) ("[A] written non-discrimination policy is one indication of an employer's efforts to comply with Title VII. But a written statement, without more, is insufficient to insulate an employer from punitive damages liability. A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate.") (citations omitted). NorDx points to no evidence that it implemented those policies.

On the second point, while a jury could have viewed the conduct at issue as relatively innocuous, it was not compelled to do so. On this record, viewing the evidence in the light most favorable to the plaintiff, the jury reasonably could have concluded that Roy dismissed Bubar's complaint of harassment out of hand on December 10, 2014, and that this was part of a pattern on

the part of NorDx's HR Department (and ultimately, NorDx) of nonresponsiveness to those complaints, including its failure to address Bubar's complaints of harassment in October 2012 and March 2013.

On the showing made, I decline to strike the jury's punitive damage award on this basis.

### iii. Lack of Involvement of Upper-Level Management

NorDx next challenges the jury's punitive damages award on the basis that Bubar failed to show that any member of its upper-level management discriminated against her because of her report that she was being harassed by Lewis. *See* Defendant's Motion at 17-18. It notes that, in *Kopenga v. Davric Me. Corp.*, 1999 ME 65, 727 A.2d 906, the Law Court vacated a punitive damages award against a company predicated on the conduct of a security director because, although the director "did have limited power to hire and fire security officers . . . and to establish work schedules and duties, he was not a member of corporate management[,]" and there was "nothing in the record to show that prior to [employee's] letter declaring her intention to quit that [the corporation] had or should have had any knowledge of [the director of security's] conduct, or that it somehow authorized, ratified, or approved it." *Id*. at 17 (quoting *Kopenga*, 1999 ME 65, ¶ 25, 727 A.2d at 911).

NorDx asserts that Bubar failed to demonstrate that any member of its upper management discriminated against her because of her reports of harassment by Lewis; more specifically, that any of the four individuals who signed her final corrective action (Gagnon, Burner, Tracy Acheson, and Pat Andrews) occupied a sufficiently high-level management position to warrant an award of punitive damages against the company. *See id*. at 18.

Yet, as Bubar notes, *see* Plaintiff's Opposition at 21, Gagnon was NorDx's HR Director, a position that courts have held sufficiently high-level to sustain a punitive damages award against

a company, *see, e.g., Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270-71 (10th Cir. 2000) (fact that harassment reports were made to company HR officer, who was designated "as a final person responsible for enforcing that company's policy against discrimination," sufficed to impute knowledge to company for purposes of punitive damage award); *Miller v. Rockford Register Star*, No. 98 C 50139, 2001 WL 637575, at *4 (N.D. Ill. June 8, 2001) (harassment reports made to company HR Director, who was "responsible for ensuring compliance with and continued implementation of the company's antidiscrimination policy according to its Employee Handbook" and was "specifically designated to receive sexual harassment complaints[,]" and her responses to them, were attributable to company for purposes of punitive damages award).[3] Neither *Kopenga* nor the case on which it relies, *Dudley*, involved conduct by an HR representative or director. *See Dudley*, 166 F.3d at 1323; *Kopenga*, 1999 ME 65, ¶¶ 3, 25, 727 A.2d at 908, 911.

NorDx rejoins that Bubar fails to offer evidence in support of her argument that Gagnon was a member of upper-level management and, in any event, "targets Gagnon only in relation to the 2012 'report' which . . . was not a report at all, and was not causally related to any adverse employment action." Defendant's Reply at 10. It adds that the plaintiff asks this court to ignore the Law Court's holding in *Kopenga* that an award of punitive damages against a corporation must be vacated when no discriminatory acts were committed by the employer's upper-level management. *See id*.

I decline to disturb the jury's verdict on this ground. First, *Deters* and *Miller* are not at odds with *Kopenga* but, rather, distinguishable in that they involved HR directors or officers. As the *Miller* court noted, "[i]n *Kolstad*, the Supreme Court acknowledged that the definition of a

---

[3] NorDx's Employee Handbook directs employees to report harassment to "your supervisor, manager or the Human Resources Director." Plaintiff's Exh. 8 at Bates No. N 2485.

'managerial employee' is vague and requires a fact-intensive inquiry." *Miller*, 2001 WL 637575, at *4 (citation omitted). Second, Bubar introduced evidence that she made all of the reports at issue to members of the HR Department and that, per NorDx's Employee Handbook, the HR Director was among those tasked by NorDx to receive harassment complaints. The jury reasonably could have inferred, based on this evidence and common sense, that the HR Department played a key role in enforcing NorDx's antidiscrimination policies. Finally, for the reasons discussed above, the jury reasonably could have deemed Bubar's voicemail to Gagnon in 2012 protected activity and inferred that Gagnon was aware of Bubar's 2013 report to Cote. The jury, finally, reasonably could have concluded that Gagnon's inaction was part of a pattern of nonresponsiveness and that Bubar's protected activity was causally related to her discharge.

### iv. Excessiveness of Punitive Damage Award

The Law Court has instructed that, in assessing whether an award of punitive damages is excessive, a court must consider "the reprehensibleness of the conduct; the amount awarded in relationship to the harm; and the amount compared with sanctions imposed for similar behavior." *Shrader-Miller v. Miller*, 2004 ME 117, ¶ 22, 855 A.2d 1139, 1145. This largely overlaps with federal constitutional analysis of whether a punitive damages award is so excessive as to offend due process. *See, e.g., Harris,* 2000 ME 150, ¶¶ 31, 35, 756 A.2d at 508, 510.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citation and internal quotation marks omitted). Factors relevant to that analysis include whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions

or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* (citations omitted).

As concerns the amount of the award in relation to the harm, the Supreme Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed" but has observed that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.

Finally, as concerns the amount of a punitive damages award compared with sanctions imposed for similar behavior, courts have looked to the most relevant criminal or civil sanctions, if any. *See id.* at 428; *see also, e.g., Romano*, 233 F.3d at 673-74.

NorDx contends that the punitive damage award assessed in this case cannot pass muster pursuant to either the first or second of the three guideposts. *See* Defendant's Motion at 20-21. It argues that the jury could not reasonably have found its conduct reprehensible, or more than minimally reprehensible, given the jury's verdict that NorDx had not discriminated against Bubar on the basis of age or disability or engaged in FMLA retaliation against her and that she was entitled to no damages for emotional pain or other noneconomic losses. *See id.* It adds that Bubar herself testified that Burner and Acheson, two of the employees who signed her final corrective action, had always treated her fairly and Burner had always tried to be "on [her] side[.]" *Id.* at 20; Bubar Tr., Vol. I at 131-32, 148 & Vol. II at 74.

It asserts that the ratio of punitive damages to compensatory damages is infinite because no compensatory damages were awarded, and the ratio to back pay is 9:1, "the highest the Supreme Court has contemplated will survive due process, except in exceptional cases[,]" which it argues this is not. Defendant's Motion at 21.

The punitive damages awarded in this case withstand this challenge.

The jury reasonably could have found that, on at least four occasions from 2012 to 2014, Bubar turned to members of NorDx's HR staff, including its HR Director, for help in ending ongoing harassment by Lewis, that those individuals either ignored or trivialized her complaints, and that ultimately she was fired in part because of them. This conduct, in turn, could have been found to have been repeated, rather than an isolated incident, and intentional, rather than an accident, rendering it reprehensible.

With respect to the ratio of punitive to compensatory damages, the jury's back pay award, which as a practical matter did "compensate" Bubar for lost pay and benefits, is the appropriate denominator. As NorDx all but concedes, the resulting 9:1 ratio is not excessive.[4]

## B. Rule 59(a) Motion for New Trial on Whistleblower Claim

### 1. Applicable Legal Standard

Under Rule 59, a court may grant a new trial on some or all of the issues submitted to the jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). When assessing a motion for a new trial, a trial judge has limited discretion:

> A trial judge may not grant a motion for a new trial merely because he or she might have reached a conclusion contrary to that of the jurors, rather, the trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.

*Conway v. Electro Switch Corp.,* 825 F.2d 593, 598-99 (1st Cir. 1987).

---

[4] NorDx does not argue that the punitive damages award is disproportionate to sanctions imposed for similar behavior. *See* Defendant's Motion at 18-21. In any event, as Bubar points out, the jury's award of $450,000 in punitive damages falls within the MHRA's statutory cap on penalties based on size of employer, which for employers such as NorDx that have more than 500 employees is $500,000. *See* Plaintiff's Opposition at 18-19; 5 M.R.S.A. § 4613(2)(B)(8)(e)(iv). "[A] punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated." *Romano*, 233 F.3d at 673.

### 2. Discussion

NorDx seeks a new trial on Bubar's whistleblower claim on the bases that the verdict in her favor was against the weight of the evidence and that the punitive damage award was clearly excessive. *See* Defendant's Motion at 22. I conclude otherwise, for the reasons discussed above.

### C. Rule 59(e) Request for Remittitur of Damages

### 1. Applicable Legal Standard

Rule 59(e) permits a motion "to alter or amend a judgment[.]" Fed. R. Civ. P. 59(e). When a party moves for remittitur pursuant to Rule 59(e), "it is within the trial court's discretion to order remittitur if such an action is warranted in light of the evidence adduced at trial." *Climent-García*, 754 F.3d at 21 (citation and internal quotation marks omitted). Only those awards exceeding "any rational appraisal or estimate of the damages that could have been based upon the evidence" warrant remittitur. *Id.* (citation and internal quotation marks omitted).

### 2. Discussion

NorDx contends that remittitur "is plainly warranted here because the punitive damages award is excessive and unsupported by the evidence," and "[t]he only explanation for such an outrageous award is that the jury was acting out of bias, prejudice, or mistake of fact." Defendant's Motion at 24. Accordingly, it seeks remittitur of the punitive damages award from $450,000 to zero. *See id.*

For the reasons discussed above, I conclude that the punitive damages award is neither excessive nor unsupported by the evidence. Accordingly, I find no basis on which to remit the jury's award of punitive damages.

## II.  Bubar's Post-Trial Motion

Bubar also files a post-verdict motion pursuant to Rule 59(e), seeking amendment of the judgment to provide equitable relief in the form of front pay and prejudgment interest.  *See* Plaintiff's Motion at 1.  I grant the motion in part, to the extent that I award prejudgment interest, albeit commencing as of the date of the filing of the complaint rather than the MHRC Charge of Discrimination, and otherwise deny it.

### A.  Applicable Legal Standard

"Generally, to prevail on a Rule 59(e) motion, the moving party must either clearly establish a manifest error of law or must present newly discovered evidence."  *Markel Am. Ins. Co. v. Díaz-Santiago*, 674 F.3d 21, 32 (1st Cir. 2012) (citation and internal quotation marks omitted).

### B.  Discussion

#### 1.  Front Pay

In an employment discrimination case, front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement" to the prevailing employee's former position.  *Johnson v. Spencer Press of Me., Inc*., 364 F.3d 368, 379 (1st Cir. 2004).  It is an equitable remedy in circumstances in which reinstatement is impracticable or impossible.  *See id*. at 380.  The parties do not disagree that Bubar's reinstatement to her former job at NorDx is impractical.  *See* Plaintiff's Motion at 3-4; Defendant's Memorandum in Opposition to Plaintiff's Post-Trial Motion To Alter or Amend Judgment ("Defendant's Opposition") (ECF No. 87) at 1.  However, they sharply disagree that such an award is warranted.

Bubar seeks an award of front pay in the sum of $200,000 discounted to present value, providing $25,000 per year for eight years, until she reaches her likely retirement age of 75.  *See*

Plaintiff's Motion at 6. She argues that the evidence at trial clearly showed that she was at an advanced age, struggled to find another job that would award her the benefits she had secured at NorDx, and ultimately took a job at York Hospital that paid no benefits. *See id.* at 5. She contends that she had "'no reasonable prospect of obtaining comparable alternative employment.'" *Id*. (quoting *Padilla v. Metro-N. Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (upholding award of more than 20 years of front pay)).

NorDx protests that such an award would overcompensate Bubar, given her own testimony that she obtained a *per diem* position working three days a week at the lab at York Hospital within three months of her firing by NorDx, was happy with that schedule, had not applied for any full-time positions at York Hospital, and had not applied for any full-time or even four-day-a-week positions at any other medical facility. *See* Defendant's Opposition at 2-4; Bubar Tr., Vol. II at 65-68. Indeed, NorDx observes, Bubar's preference for a shortened work schedule is borne out by her use of vacation time to work a lighter schedule of three days per week by the end of her employment with NorDx. *See* Defendant's Opposition at 4 n.1; Bubar Tr., Vol. II at 37-38.

NorDx has the better argument. As NorDx points out, *see* Defendant's Opposition at 2, "front-pay awards, like all damages awards, may not be determined by speculation or guess, must be causally related to the defendant's wrongdoing, and should not make the plaintiff more than whole[,]" *Travers v. Flight Servs. & Sys., Inc*., 808 F.3d 525, 544 (1st Cir. 2015) (citations and internal punctuation omitted). A plaintiff "is required to use reasonable diligence in finding other suitable employment." *Padilla*, 92 F.3d at 125 (citation, internal quotation marks, and emphasis omitted).

Simply stated, Bubar fails to show that a job with pay and benefits comparable to those she received at NorDx was unavailable to her had she desired it. As NorDx argues, *see* Defendant's

Opposition at 8-9, her situation is materially distinguishable from that in *Padilla*, in which the plaintiff requested front pay until he was 67, not 75, and adduced evidence that his former position "was so specialized as to be virtually unique[,]" with "no comparable positions in other industries[,]" *Padilla*, 92 F.3d at 125 (internal quotation marks omitted).

In these circumstances, NorDx cannot be held responsible for the difference in pay and benefits between the two jobs. My omission of a front-pay award, accordingly, is not manifest error requiring correction pursuant to Rule 59(e).

### 2. Prejudgment Interest

The plaintiff finally seeks an award of prejudgment interest pursuant to 14 M.R.S.A. § 1602-B on her $50,000 back-pay award for the approximately two-year period after her April 9, 2015, filing of a Charge of Discrimination with the MHRC, which she calculates at $1,567.50 for the first year ($25,000 x 6.27%) and $1,662.50 for the second year ($25,000 x 6.65%). *See* Plaintiff's Motion at 6.

NorDx acknowledges that, if the court does not grant its renewed motion for judgment as a matter of a law or a new trial, Bubar is entitled to prejudgment interest on the back pay award. *See* Defendant's Opposition at 10. However, it asserts that Bubar calculated interest at the wrong rate, accruing from the wrong date. *See* Defendant's Opposition at 10-11. Bubar concedes that the correct interest rate is 3.27 percent but maintains that interest should accrue from the date she filed her Charge of Discrimination with the MHRC, April 9, 2015, rather than the date she filed her complaint in this court, April 11, 2016, as argued by NorDx. *See* Plaintiff's Reply Memorandum in Support of Motion To Alter or Amend Judgment ("Plaintiff's Reply") (ECF No. 91) at 4.

I agree with NorDx that Bubar fails to demonstrate that interest should run from the date of the filing of her MHRC charge.

The governing statute provides that "[p]rejudgment interest accrues from the time of notice of claim setting forth under oath the cause of action, served personally or by registered or certified mail upon the defendant until the date on which an order of judgment is entered." 14 M.R.S.A. § 1602-B(5). "If a notice of claim has not been given to the defendant, prejudgment interest accrues from the date on which the complaint is filed." *Id*.

NorDx argued that, as in *Ranquist v. M & M Indus., Inc*., No. 2:11-cv-387-DBH, 2012 WL 1899540 (D. Me. May 2, 2012) (rec. dec., *aff'd* May 23, 2012), while the filing of a Charge of Discrimination with the MHRC "arguably served as a 'notice of claim'" for purposes of section 1602-B(5), Bubar had not "alleged in her complaint, or otherwise adduced evidence, that her Charge of Discrimination was made under oath or served personally or by registered or certified mail upon the defendant[.]" Defendant's Opposition at 10-11; *Ranquist*, 2012 WL 1899540, at *9.

In response, Bubar appended a copy of her Charge of Discrimination to her reply brief, *see* Exh. A (ECF No. 91-1) to Plaintiff's Reply, contending that the charge was both made under oath and sent to NorDx by the MHRC, as is standard protocol, *see* Plaintiff's Reply at 4.

Yet, as in *Ranquist*, Bubar fails to meet the requisites of section 1602-B(5). An exhibit appended to a reply brief is not evidence, and a review of the trial exhibit list confirms that Bubar did not seek to introduce the Charge of Discrimination as evidence at trial, *see* Exhibit List (ECF No. 76). In any event, even if she had, her representation in her brief that the charge was sent to NorDx by the MHRC pursuant to standard protocol does not demonstrate that the charge was made under oath and served personally or by registered or certified mail on NorDx as required by section

1602-B(5).  Prejudgment interest, hence, accrued on the jury's $50,000 award of back pay at the rate of 3.27 percent from the date of the filing of the complaint, April 11, 2016, through the date of judgment, April 19, 2017, resulting in an award of $1,635.

### III.  Conclusion

For the foregoing reasons, I deny NorDx's motion, grant Bubar's motion in part to the extent that I award prejudgment interest, albeit in the sum of $1,635 rather than $3,230, and otherwise deny it.

Dated this 4th day of February, 2018.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge
